IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MATTHEW JONES, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 19-896-RGA |
| OFFICER WILLIAM THOMAS, | : |
| Defendant. | : |

Matthew Jones, Greenwood, Delaware.   Pro Se Plaintiff.

Daniel A. Griffith, Esquire, Whiteford, Taylor & Preston, L.L.C., Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

September 13, 2023
Wilmington, Delaware

*/s/ Richard G. Andrews*
**ANDREWS, U.S. District Judge:**

Plaintiff Matthew Jones, who appears *pro se* and has been granted leave to proceed *in forma pauperis* filed this action on May 13, 2019. (D.I. 2). The matter proceeds on the Amended Complaint. (D.I. 8). Before the Court are the parties' cross motions for summary judgment. (D.I. 59, 96), and Plaintiff's motion for contempt of court (D.I. 101). The summary judgment motions are fully briefed.

### BACKGROUND AND FACTS PRESENTED BY THE PARTIES[1]

The Amended Complaint alleges that on November 1, 2017,[2] Defendant Officer William Thomas, an employee of the municipality of the Town of Greenwood, Delaware, and others searched Plaintiff and his home without a warrant; that after Defendant asked Plaintiff several questions he determined that Plaintiff was a threat to himself and

---

[1] The relevant record consists of the following documents: Plaintiff's deposition (D.I. 97-2, Exh. B); the "Initial Behavioral Health Assessment" which was generated by Mobile Crisis and submitted by Plaintiff (D.I. 67 at 2-3); two police reports created by Defendant (D.I. 31 at 4, 16-18; D.I. 62 at 2-4); two of Plaintiff's Facebook posts (D.I. 62 at 5-6); Plaintiff's mother's notarized statement (D.I. 66 at 4); and Plaintiff's Facebook live video (D.I. 65). I note that the two police reports are public records. Fed. R. Evid. 803(8); *see Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991). I also note that statements of third parties in a police report might be hearsay if offered to prove the truth of the matter asserted. Here, though, such statements are not hearsay to the extent they are probative of the information known to Defendant at the time he went to Plaintiff's home. *See Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019). The Initial Behavioral Health Assessment is admissible as a business record of Mobile Crisis Intervention Services. There is no dispute as to the admissibility of the two Facebook posts and the Facebook video.

[2] Plaintiff refers to November 1, 2017 as the relevant date (D.I. 8, ¶ 3), and Defendant refers to November 17, 2017 as the relevant date in his motion for summary judgment (D.I. 97 at 8). The reports submitted to the court indicate the incident complained of occurred on November 9, 2017. (D.I. 62 (two police reports) & D.I. 67 (Initial Behavioral Health Assessment)). Plaintiff's testimony about the football game he was watching also places the relevant date as November 9, 2017.

1

others and "judged" Plaintiff as having schizophrenia; and that Defendant removed Plaintiff from his home and transported Plaintiff to Nanticoke Hospital where Defendant recommended that Plaintiff be involuntarily held and medicated. (D.I. 8 at 1, 4-5). The Court liberally construed the Amended Complaint upon screening and determined that it alleged what appeared to be a Fourth Amendment warrantless search and seizure claim of Plaintiff and his home pursuant to 42 U.S.C. § 1983. (*See* D.I. 9 at 6, D.I. 10).[3]

On November 9, 2017, the Greenwood Police Department received a telephone complaint that Plaintiff was trespassing after hours at the Woodbridge Early Childhood Education Center and taking photographs through the building's windows. (D.I. 62 at 4). While at the school, Plaintiff came into contact with Paula Steele, her spouse, and child. (*Id.*). Defendant responded to the call and checked the area "with negative contact with Jones." (*Id.*).

Next, Defendant and an officer from the Bridgeville Police Department went to Plaintiff's residence in Seaford, Delaware. (*Id.*) Plaintiff's mother, Linda Jones, answered the door, advised the officers that Plaintiff was not at home, and said she did not know when he would return. (*Id.*). She told the officers that Plaintiff had recently been taking photographs and "is becoming a photographer." (*Id.*). The officers asked Ms. Jones to have Plaintiff contact the Greenwood Police Department and informed Ms. Jones that the school did not want Plaintiff on the property, and if Plaintiff went onto school property, he would be arrested for trespassing. (*Id.*).

---

[3] Plaintiff brought additional claims against Thomas and other defendants, but those claims and defendants were dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i). (D.I. 9, 10).

That evening, Plaintiff posted comments on his public Facebook account that resulted in reports to the Greenwood Police Department. (*Id.* at 6-8). Plaintiff testified at his deposition that he tagged the Greenwood Police Department in the first post because he wanted the police to see it, and that he wrote the second post while cooking dinner. (D.I. 97-2 at 5, 6).



**Matthew Jones** is at **Greenwood Police Department.**
November 9, 2017 · Greenwood, DE · 🌐

Almost Arrested
The Greenwood Police Department & The Delaware State Police of Bridgeville, came to my home to take me away while I was gambling at the Harrington Raceway and Casino. They said that I was Trespassing on Private Property in Greenwood at the Woodbridge Elementary School. Are Identity Thieves allowed to practice Law on the Police Department? They are all Identity Thieves. Is the school public or private property? It is public. I was there after school hours, from 4=5:30. I did not go inside. I photographed where Doe the Deer used to be & the 4th-6th Grade Playground. They told Linda to threaten me not to go back. They may return. I am a U.S. Constituent. Google Earth has identified all local and local state police officers to be pedophiles and murderers while on duty. Identity Theft, Pedophilia, and Murder are Capital Offenses. As a Constituent, what am I supposed to do to remedy the Terroristic Police Officers imposing their slave whelp pussy will in my Jurisdiction? They have confessed to murdering over 100 children each, each season. 100 children is way too many to lose before the cops die when worms eat out their faces and they die fat. What do you think? Google Earth has recorded all people, places, and things. Our entire lives can be watched and rewound. Where is our manhoods?



Matthew Jones is at National FFA Organization.
November 9, 2017 · YouTube · 🌐

Paula Williams
I saw Paula while I was at the Woodbridge School District Elementary School Playground. She's a 'died a lot type' in school. We often rode the same school bus. In elementary school, she often stayed after school with Kaylan Hunsberger, Leslie Schaap, Coly Pusey, Tori Stogner, and I. We played in the gym. She died at least once every semester. She mostly lived in a trailer on US 13 Sussex Highway up the street from me. She was always very short. Adam killed her when they dated, before he went to jail. I wonder if she is who called the police on me? She split times in cops basements, located in Bridgeville and Laurel. Officer Holcomb is one Greenwood cop who had her locked downstairs in K-12. As an adult, she has had many children in the past, and married more than once. I guess she works at the school now. She said there were conferences and asked if I needed directions. She's thin again. A man holding a baby was with her. She's still exceptionally short and wears the black hair cut that she had in middle school. Since when is it illegal to be on school grounds after hours? I guess since I am a U.S. Constituent, I know who to call...- I checked Google Earth 24 Lifelong Surveillance. I may have to readjust my life. It seems that all the whelps with worms growing out of their faces for betrayals like pedophilia are being directed to Delaware as the nation rebuilds and healthy children are born.

Due to concerns regarding the nature of the complaints, Defendant contacted Mobile Crisis Intervention at approximately 8:15 p.m.[4] (D.I. 62 at 6; D.I. 67 at 1). Mobile Crisis agreed that it was appropriate to make contact with Plaintiff and advised the Greenwood Police Department that it would not go to Plaintiff's residence alone due to past experiences with Plaintiff. (D.I. 62 at 6). Mobile Crisis noted in its Initial Behavioral Health Assessment, "Per Police [Plaintiff] has previously posted Facebook messages concerning the school and police were posted in school for safety." (D.I. 67

---

[4] The Delaware Division of Substance Abuse and Mental Health offers Mobile Crisis Intervention Services (or MCIS), twenty-four hours a day to assist people, eighteen years and older, with "severe personal" problems including "thoughts of suicide, delusions, paranoia and substance abuse." "[C]risis staff work in conjunction with every police department throughout the state, . . . [including] assisting in the evaluation of persons picked up on criminal charges who may require mental health evaluations and who may be appropriate for the State's Mental Health Courts." See https://www.dhss.delaware.gov/dsamh/crisis_intervention.html (last visited August 21, 2023).

at 3). Police officers from the Delaware State Police, Bridgeville Police Department, and Greenwood Police Department met with Mobile Crisis at a Royal Farms and, together, went to the residence. (D.I. 62 at 6).

Officers arrived at Plaintiff's residence around 9:00 p.m.[5] Ms. Jones' notarized, but unsworn, statement states that she did not give Defendant permission to enter her house and told him not to come into her house. (D.I. 66 at 4). Ms. Jones does not specify which incident she is referencing, but, giving the *pro se* Plaintiff the benefit of the doubt, I assume it is the relevant incident. Plaintiff testified at his deposition that his mother told him that she did not let the officers in, and that they had forced their way into the residence. (D.I. 97-2 at 6-7). Defendant states in an unsworn discovery

---

[5] In his motion for summary judgment, Plaintiff asserts that his mother told him the police arrived at the house after midnight. (D.I. 59 at 8, 11). This assertion does not create a disputed fact. It is simply hearsay. Defendant's police report and Mobile Crisis' Initial Behavioral Health Assessment both place the arrival around 9:00 p.m. (D.I. 62 at 5; D.I. 67 at 2). A Facebook Live video Plaintiff posted of the encounter that was submitted to the Court, however, has a date of November 10, 2017, and a time of 2:26 a.m. (D.I. 65). The time stamp does not change during the six-minute video. Rather, it remains at 2:26 for the duration of the video. That would be consistent with the copy of the video provided to Court being downloaded from Facebook at 2:26 a.m. on November 10, 2017. Defendant's police report notes, "Pictures and video from Jones's Facebook have been saved and attached to this report." (D.I. 62 at 6). In his February 10, 2023 deposition testimony, Plaintiff testified that he fell asleep while watching football, and that the officers arrived "anywhere between 9:30 and after midnight." (D.I. 97-2 at 6). Plaintiff testified that he knew it was after 9:30 because he had watched some of the Thursday Night Football game; Thursday night football games begin around 9:00 p.m.; he had fallen asleep early in the game; and he had seen "a few scores each, both teams." (*Id.* at 6, 13). He also testified that he "remember[ed] seeing Fitzgerald score a touchdown." (*Id.* at 13). I take judicial notice from publicly available sources that the November 9, 2017 Thursday Night Football game between the Seattle Seahawks and Arizona Cardinals began at 8:25 p.m., and that no player named Fitzgerald scored a touchdown, although Larry Fitzgerald of the Cardinals led the game in receptions and receiving yards.

5

response that Plaintiff's mother gave permission to enter the home.  (D.I. 31 at 25, ¶ 11).

Plaintiff's "arms and hands [were] shaking in a[n] up and down motion; . . . he answered some questions by Mobile Crisis, and was still not acting appropriately." (D.I. 62 at 6).  Mobile Crisis advised Plaintiff that he would undergo a 24-hour emergency psychiatric medical evaluation, and he was taken into custody.  (*Id.*) Mobile Crisis conducted an initial behavioral health assessment that began at 9:10 p.m. and ended at 9:25 p.m. on November 9, 2017.  (D.I. 67 at 2).  The bulk of the report responds to the question, "Why does this person require a Mental Health Assessment for a 24-Hour Emergency Detention?"  The response is, "Upon arrival @ Ct residence Ct began shaking and yelling @ police.  Ct stating you raped me to officer.  You are marked for execution and you have just killed yourself.  Ct. yelling @MCIS and police that you have "stolen faces" and "raped" hundreds of children. Ct told MCIS he outranked all police and MCIS/Police were in violation of terrorist act.  Per Ct's mother Ct is not on any psych. medication."  (D.I. 67 at 2).

Once the officers were inside the home, Plaintiff recorded the incident and streamed it on Facebook Live.  (D.I. 62 at 6; D.I. 65).  The video recording is about six minutes long.  (D.I. 65).  The video depicts Plaintiff moving from a hallway into the kitchen, Plaintiff speaking to the officers, Plaintiff being questioned about his mental well-being by Mobile Crisis, Plaintiff being informed by Mobile Crisis that he was being placed on a "twenty-four hour detention for impaired mental condition," and Plaintiff stating that he would "honor that."  (D.I. 65).

## LEGAL STANDARDS

Rule 56(c) requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

As a general rule, the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

> Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a

7

court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (citations, quotations, and alterations omitted). The same standards and burdens apply on cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

## DISCUSSION

Plaintiff moves for summary judgment on all claims he initially raised. The only claim that remains is the Fourth Amendment claim and, therefore, his motion is construed as seeking summary judgment for that claim only.

Defendant moves for summary judgment on the grounds that he is entitled to qualified immunity as he did not violate Plaintiff's constitutional rights, Ms. Jones gave permission to enter the home and, in the alternative, exigent circumstances existed to justify entry into the residence. (D.I. 61 at 7-11).

Qualified immunity can protect a municipal officer from liability in a Section 1983 case. *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005). "Qualified immunity shields government officials from personal liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A court must engage in the following two-part inquiry to determine whether qualified immunity applies: (1) whether the allegations, taken in the light most favorable to the party asserting the injury, show that defendant's conduct violated a constitutional right; and (2) whether the constitutional right at issue was clearly established at the time

of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts have discretion to consider either prong of the two-part analysis first. Id. at 236.

"The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). In deciding qualified immunity questions at summary judgment, a court must view the material facts in the light most favorable to the plaintiff. *See Scott v. Harris*, 550 U.S. at 378. Summary judgment may be granted to an officer if, when interpreting the facts in the light most favorable to the non-moving party, the court determines that the evidence does not support a violation of a clearly established constitutional right. *Mitchell v. Forsyth*, 472 U.S. 511, 546 (1985) (stating that "when a trial court renders a qualified immunity decision on a summary judgment motion, it must make a legal determination very similar to the legal determination it must make on a summary judgment motion on the merits"); *see also Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Scott*, 550 U.S. at 378.

The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures inside someone's home . . . are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." *United States v. Coles*, 437 F.3d 361, 365-66 (3d Cir. 2006) (citing *Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton v. New York*, 445 U.S. 573, 586 (1980)). Defendant has the burden to demonstrate that an exception to the warrant requirement is present. *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014).

9

Taken in the light most favorable to Plaintiff, there is an issue of fact as to whether consent was given to enter the home. Plaintiff states that no permission was given to enter the home and therefore, the entry was unlawful, while Defendant contends that Plaintiff's mother gave permission to enter the home and the warrantless entry was lawful. Given this factual dispute, I will assume for purposes of this motion that Defendant did not have consent.

In the alternative to arguing consent, Defendant argues that exigent circumstances existed to justify entry into the residence. A warrantless home entry and search "is presumptively unconstitutional, but 'exigent circumstances' can excuse the warrant requirement." *Kubicki v. Whitemarsh Twp.*, 270 F. App'x 127, 128 (3d Cir. 2008). "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others, *United States v. Coles*, 437 F.3d at 366, or "when police "reasonably believe that someone is in imminent danger." *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996). "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); see also *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) ("In these limited situations [where there are exigent circumstances], the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion."). "[A] showing of probable cause in the mental health seizure context requires only a 'probability or substantial chance' of dangerous behavior, not an actual showing of such behavior." *Monday v.*

10

*Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). In addition, "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). The question is whether the circumstances, "viewed objectively, justify the action." *Id.* at 404 (cleaned up).

There was objective justification here. The responding officers could have reasonably believed that Plaintiff was an imminent threat of physical harm to himself or to others. His postings on social media, set forth in full above, were delusional, unnerving, bizarre, and arguably threatening to law enforcement and private individuals. He also tagged the Greenwood Police Department, wanting them to see the posts, which could arguably be construed either as a cry for help or a provocation, either of which could support exigent circumstances. The timeline of Defendant's actions also support the existence of exigent circumstances. In late afternoon, Defendant responded to reports of Plaintiff's bizarre behavior at the school. Defendant followed up at Plaintiff's home but failed to establish contact with him. Later, while making dinner, Plaintiff posted his second concerning Facebook post. Although it unclear what time the posts were made, or when Defendant first became aware of them (from the Police Department having been tagged in one of the posts or public reports of the posts), Defendant contacted Mobile Crisis by 8:15 p.m., quickly mobilized various authorities, and arrived at Plaintiff's home around 9:00 p.m.

In addition, Mobile Crisis informed law enforcement that it had had previous issues with Plaintiff in the past and would not see Plaintiff alone. Mobile Crisis also

11

indicated that in the past police officers had been posted at the school for additional safety in response to Plaintiff's disturbing Facebook posts.

These facts support a finding that information available at the time could lead law enforcement officers to reasonably believe that Plaintiff was an imminent threat of physical harm to himself or others. Analogous facts were presented in *Miller v. Brady*, 639 F. App'x 727, 833-34 (3d Cir. 2016). There, the Court held that a police officer was entitled to qualified immunity from a Fourth Amendment claim based on allegations that officer made a false report to attempt to confine arrestee to psychiatric facility. The officer's actions in contacting psychiatric emergency services were reasonable. The arrestee's behavior was irrational at the time of his arrest, and his prior behavior was too. The officer had sufficient probable cause to believe that arrestee was in need of psychiatric evaluation, a conclusion that was supported by an independent assessment that the arrestee should be transported to the hospital for further evaluation.

Here, the reasonableness of Defendant's belief that Plaintiff might be in need of immediate aid was confirmed by Plaintiff's actions when officers arrived at his home. My review of the video confirms that Plaintiff was agitated and speaking bizarrely about "treason against the United States," "stolen faces," "new faces," rape of himself and rape of children "to death" by the police, the police being "identity thieves," "one of his original kidnappers," the persons in his house "being marked for execution by hanging," and murder of his girlfriend by the police.[6] No reasonable jury could conclude that a

---

[6] The video, available in the case file, speaks for itself. (*See* D.I. 65).

constitutional violation occurred when law enforcement entered Plaintiff's home without a warrant. Thus, I do not need to consider the second prong of the qualified immunity analysis.

Finally, and as shown on the video, it is unrefuted that Defendant had no involvement in the decision to detain Plaintiff or the actual detention of Plaintiff.

Therefore, Plaintiff's motion for summary judgment will be denied and Defendant's motion for summary judgment will be entered.

## CONCLUSION

For the above reasons, the Court will deny Plaintiff's motion for summary judgment (D.I. 59), grant Defendant's motion for summary judgment (D.I. 96), and deny Plaintiff's motion for contempt of court (D.I. 101).

An appropriate order will be entered.